**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DANIEL LOUGHMAN | Criminal No.: No. 24-cr-10121 |

## DEFENDANT DANIEL LOUGHMAN'S SUPPLEMENTAL SENTENCING MEMORANDUM

Now Comes Daniel Loughman, ("hereinafter Defendant and/or Loughman") by and through undersigned counsel, and respectfully submits the following Supplemental Memorandum in support of his upcoming sentencing hearing scheduled for **April 1, 2026**.

Probation originally submitted a PSI, that calculated Defendant's USSG at **level 34**, with a three-level reduction for acceptance of responsibility, along with a criminal history category of II counting one prior conviction, resulting in a guideline imprisonment range of **121-151** months. Id. ¶ 113 (Level 31, criminal history II = 121-151). Defendant did not disagree, in essence, with that calculation as it comports with the guidelines' standard requirements however he Objects through Counsel to the additional two enhancements that the Government is now seeking.

Specifically the Defendant Objects to the two enhancements, for sentencing purposes, the Government now seeks, specifically: (a) "Para 18 - Defendant's offense level is increased by 2, because a dangerous weapon was possessed (USSG §2D1.1(B)(1))" and (b) "Defendant's offense level is increased by 2, because the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance (USSG §2D1.1(B)(13)[sic]" It should be noted, of course, that the Government has failed to back up its request with any evidence

1

supporting these enhancements other than reference to the PSI. In that respect, the paragraphs of the PSI which the Government relies on state in full:

¶ 18   "Following an attempted controlled purchase with CW-1, Loughman was arrested on March 6, 2024, for an outstanding state warrant following a motor vehicle stop. During Loughman's arrest, investigators recovered a knife and a cell phone, amongst other items, and a cell phone extraction  subsequently revealed evidence of the drug distribution investigation.

Located on the front passenger seat next to Loughman during his arrest was a green nylon bag that contained two wrapped packages of pure methamphetamine, which had a combined weight of approximately 2.12 pounds. The pure methamphetamine weighed approximately 892 grams and was sealed and submitted to the DEA's NRL. The NRL subsequently identified the substance as methamphetamine hydrochloride with a substance purity of 100% ± 7%."

¶ 21   "Investigators also utilized poll cameras, including during a controlled purchase in January of 2024, and observed Adams drive to Loughman's residence on January 9, 2024, in Wakefield and meet with Loughman in the driveway, while on the phone with CW-1. CW-1 confirmed on the phone with Adams that CW-1 wished to buy "1 pound" of meth tomorrow (January 10th). Adams went back inside the house with Loughman and when he exited, a female party followed Adams out, carrying a canvas bag. The following day, Adams sold the methamphetamine to CW-1 and phone toll analysis also discovered 8 phone calls between Adams and Loughman on January 10th."

Therefore, Defendant contends based on the above as well as for the following reasons, there is insufficient evidence that Mr. Loughman either possessed a weapon during a drug transaction or that he maintained his residence for the purpose of dealing or making drugs.

1.   **Possession of a knife**.

The Government has not presented an iota of evidence that the knife in question was present, visible, or used in some manner during any drug transaction in this case. SA Flick merely states in an affidavit in support of a search warrant that "during the investigation" items were seized, including a knife." Where the knife was seized is not exactly mentioned; however, the knife is only mentioned in a paragraph right after discussion of Mr. Loughman's arrest after a motor vehicle stopped by the Massachusetts State Police ("MSP"), and an inventory of his vehicle before it was towed. *See Flick Affidavit 3-7-24* ¶¶ 11-14. This indicates that the knife was found in the vehicle hidden away in some area of the vehicle. Mention of the knife comes in the section of the Affidavit that is entitled "II Loughman's Arrest on March 6, 2024". No drug transaction had taken place upon Mr. Loughman's arrest or before and no one has attested to the fact that they saw a knife in Mr. Loughman's possession and/or near him during any drug transactions.

In the 2D1.1. Application Notes at paragraph 11(A), the Guidelines caution that the "enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at defendant's residence, had an unloaded hunting rifle in the closet." This makes more sense than what the Government is proposing in this case. Indications are that the knife was found during the inventory of Mr. Loughman's vehicle prior to it being towed. There is no evidence that a knife was used or displayed during any drug transactions. If what the Government proposes is applied, then when a defendant is arrested in his residence, the Government can ask for this enhancement when they go into the kitchen and find steak knives in a drawer.

3

No person involved in this case has stated that they observed Mr. Loughman with a knife during any transaction. The Government failed to produce any timely evidence of such. They merely now claim that Mr. Loughman had possession of a knife without providing any details or an indication that it was used in a crime or somehow during a drug transaction.

If this enhancement is contemplated, we certainly would reserve the Defendant's right to request more specific evidence regarding how it applies and reserve our right to a hearing and cross-examination of anyone who testifies there was a knife used during drug transactions.

**2.      Maintaining Premises for Drug Transactions.**

Pursuant to § 2D1.1 (b)(12) a 2-level increase can be applied only "if the defendant maintained a premise for the purpose of manufacturing or distributing a controlled substance."

Clearly, as paragraph 21 of the PSI demonstrates, the residence in question was Mr. Loughman's residence.  It was not "maintained" for drug activity but as a dwelling for Mr. Loughman to live and reside in. Moreover, it is a stretch of the imagination to say that because someone had a conversation on their phone with a CW that Mr. Loughman maintained his residence for drug deals, not as his usual abode for consistent living. In the same vein, paragraph 21 fails to indicate that some "female" carrying a bag while following Adams amounted to a drug transaction—nor did that fact establish it was caried out in the Defendant's residence, but just the opposite.

Mr. Loughman's residence was not a "stash house" as in the case of *U.S. v. Castillo*, 156 F.4th 257, 284 (1st Cir. 2025). In that case the court held that the "government must prove that a sentencing enhancement applies by a preponderance of the evidence." *Id*.  In *Castillo* it was fairly debatable whether or not the premises in question was a stash house. The only evidence offered in this case by the government is that Mr. Loughman had a "residence" and that there

4

was *one* instance of some unspecified activity that occurred there that the government believes is drug activity and that someone was talking on the phone at that residence about a future drug transaction.

The most significant reach of this enhancement, where it concerns residences, is spelled out in the Commission's application notes for this enhancement at Commentary ¶ 17:

> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained but *must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises*. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and *how frequently the premises was used by the defendant for lawful purposes*

(Italics provided). In this case, the facts corroborate that Mr. Loughman lived at the residence and the government points to only *one* incident to back up their request for a 2-level enhancement.

The First Circuit has discussed the principles behind the enhancement for residential premises.

> Whether the distribution of controlled substances constitutes a principal use of a premises is a fact-sensitive question. Ordinarily, the answer to this question 'may be inferred from the totality of the circumstances.' ... Pertinent circumstances typically include the activities observed, the quantity of drugs discovered, and the presence or absence of drug paraphernalia and tools of the trade. … Relatedly, application note 17 suggests consideration of 'how frequently the premises was used by the defendant for ... distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.' [1]

*See United States v. Melendez-Rosado*, 57 F.4th 32, 39 (1st Cir. 2023). *See further*, *United States v. Esteras*, 102 F.4th 98, 105 (2nd Cir. 2024) (referencing Circuit cases dealing with the subject of use of residential premises related to this enhancement)

Before this "premises" enhancement can be attributed to Mr. Loughman, the government needs to come up with evidence that the residence was used primarily for drug distribution. Nothing indicates that it was in fact used primarily for "drug distribution." The government needs to produce evidence so that the undersigned counsel can examine it and contest it at a hearing or other proceeding that has some due process attached to it.

Neither of the enhancements requested by the government apply to the facts of this case. Should the Court be inclined to consider giving them, then counsel requests a hearing to contest any alleged facts that support the enhancements.

Notwithstanding the above, counsel respectfully suggests that the three-point reduction in this case does not sufficiently account for the depth of Defendant's acceptance of responsibility. The docket consists of 130 entries, demonstrating that since this matter began some two years ago the Defendant has not filed even one adversarial motion to contest the case or request rulings by the Court that may favorably affect Defendant's position. In counsel's view, some matters could certainly have been contested with respect to the gathering of evidence in this case—*e.g.*, at least one questionable search of suspected contraband that could have led to suppression of substantial evidence or an appeal of same if a denial of a motion ensued. Nevertheless, Defendant has accepted full responsibility for his overall acts and did not want to burden the Court and/or the Government from having to litigate. As shown below, this is because the Defendant is sincerely seeking to change his behavior that led to the instant charges. Moreover, the Court ought to also take notice that Defendant always waived his personal appearance in

court whenever asked to do so, thus saving the Government substantial costs, resources and effort by not requesting that he be physically brought into Court.

In that respect, the Defendant is ("accepting full responsibility") from the date of his arrest. Therefore the three-level downward adjustment is not sufficient to reward the Defendant for his acceptance of responsibility and should be double that—or six levels. This would bring the guideline range down to **Level 28** with a sentencing range of 87-108 months. Because of other factors the Court ought to consider in this case as shown below, counsel would ask the Court to consider sentencing the Defendant to the bottom of this recalculated range.

As the Court is aware, the guidelines are advisory and not mandatory. allowing for departures and variances. *See, e.g. United States v. Booker*, 543 U.S. 220 (2005). Consequently, the Court has the authority to give the Defendant more substantial credit for acceptance than the guidelines themselves suggest.

2.    There is little doubt in counsel's mind, after considerable investigation of the Defendant's background, that this case—and the Defendant's anti-social behavior for most of his adult life—stems from his abuse of drugs and alcohol. ("See Exhibits A&B filed herewith") Counsel believes that if the Defendant was not under the influence of drugs in some manner, he would not have been involved in the type of conduct that has been exhibited in this case and in other incidents. All his illegal and other acts were driven by substance abuse and personal trauma. Without these abuses, it's clear that the Defendant would have used his mechanics talent in a manner that the general society expects.

Undersigned counsel could certainly make a more formal argument in support of his claim that drugs and family trauma steered the Defendant into his current position. But counsel believes that the Defendant's own words, while not grammatically correct, certainly speak more

7

eloquently than anything counsel could write. In that respect, considering editing because of

attorney/client privileged material, counsel quotes from an October 1, 2025 letter that the

Defendant wrote to the undersigned about his past behavior:

> *** *So, I will be honest with you and say I had a very good upbringing but there were some unfortunate events to say. I will tell you everything I can …*
>
> *So my parents got divorced when I was 4 because my father was an abusive drunk. … He was not the greatest dad, but he was still my dad. The last year he was alive we started to get along but when I was 16, he was hit by a Mac truck. The truck driver fell asleep and hit my dad's Blazer when he was on his way to work on 11/30/2001. My dad was on blood thinners for a heart value he had replaced 5 or so years prior. He hit his head bad and had internal bleeding of the brain. My stepdad tried very hard to be there for me, but I never gave him a chance. I was fucked up in my head for a very long time because of my father's death, which lead to my drug use and addiction. At 16, it is a hard time for a child to lose your father. I was a coke addict till I was in my 20s. Then I stopped on my own at 21 but replaced It with drinking.*
>
> *Now what I am going to get into next is about my wife.*
> *I just want to say she became an amazing mother, but what happened between her and I was a mess. Just don't think ill of her please. It's just what I am going to say about her fucked me up for life. Now after I got married, I found out my wife of three months was checking on me with her boss and stole a lot of money from me for drugs. I gave her another chance because we had just got married and I was 24 years old and did not know what to do. Fast forward 2 years later, I find out she is getting fucked up -again on perks and benzos and cheating on me again for a few months. She also was pregnant with our first kid. I also found texts of her and the [guy] she was cheating on me with, telling each other that they loved each other. That is what fucked me up in my head and changed me forever.*
>
> *The reason why I did not find out for a few months is because I was working 70 plus hours a week and drinking a lot *** she found out she was three months pregnant. That is when she cold turkeyed all drugs by herself in our bedroom and never looked back. She turned her life around and never did drugs again. She is an amazing mother to my kids. Now because she was pregnant with our first kid is why I took her back. However, her and I were never the same after that.*
> *Two years later we had one more child. I unfortunately sunk deeper into depression and drinking and drugs. I never let any of it affect my work as a mechanic.*
>
> *I was working 70, 80, 90 hour weeks to support my family and habits. Then I started to do side work at home and that is when I stopped drinking and doing coke every day because I could not justify being drunk and working on someone's car. If something happened to anyone driving after I worked on their car drunk, I could not live with*

*myself. However, sober life I could not do, because I was stressed and super depressed from my life leading up to that point and working 100 plus hours a week and all the fighting my wife and I were doing. Now add being exhausted from working that much and depression is what lead me to meth and the next 10 years of doing meth and my life spiraling out of control led me to this point. After 10 years of marriage, we separated and could not stand each other anymore. All my friends and most of my family all turned their backs on me at the start of my divorce. Then a couple years later I got fired from the shop I worked at for 14 years. Then I worked out of my driveway for a few more years. Then I dove deeper and deeper into my depression, which made me do more and more drugs. I felt like the biggest shit bag.*

*I then started not being there for my amazing children. I have 2 beautiful daughters that I will now miss the rest of their childhood and beginning of adulthood. I want to see grow up but I fear I will miss that, and they will hate me for that. Before I got arrested, I was trying to find a shop for me to start my own shop.  I have been a mechanic for 18 years and have just about $100k of tools and equipment I have collected over 18 years that I will still have when I get out. Now I need money to start the shop and I was behind on Child Support is why I delt with meth.*

*Now that I have been sober for almost 2 years, I have had a lot of time to think and talk about my problems and learned how to deal with them in a much healthier way and also come to terms with my depression. I also have come up with a few different ways on how I will start my shop the right way and do the right things. I am going to name my shop A and V Automotive. which stands for Amelia and Violet, I am naming after my Kids. I also want to go to NA meetings and talk to people and try to help people to get off drugs. I hope me telling my story to people will help them turn their lives around.*

*When I open my own shop I want to host NA meetings or some type of meetings, so I can help people get and stay clean. I don't want to do drugs anymore. All I want is to see my kids, open my shop and work on cars and bikes, and help others stay clean and sober. Also I do need to add is that my stepdad is dying of cancer and I don't think I will be out before that happens. My mom also had a heart attack last year and I don't want to lose her while I am locked up.*

*I think that is all I can think of to tell you. \*\*\**

*p.s.      \*\*\* I forgot to say that all I want to do is keep working on my craft of being a mechanic and a welder. Unfortunately, because of the open detainer I can't go to a minimum where they have the Automotive tech and Diesel tech programs. So the only Programs I can do is the welding in Norfolk. I will also do the culinary arts. and   maybe the barber as well.*
*\*\*\* So, when I get to the feds I want to be able to talk freely without getting in more trouble. Also do every and any Automative programs for cars, trucks, and boats. Plus welding. If there is a camp in Florida, so I can be close to my parents, that would be great to go to*

9

In undersigned counsel's opinion, this narrative by the Defendant, and counsel's discussions with him about his past, unquestionably demonstrates that Defendant's former lifestyle was drug-driven and involved several serious traumatic experiences. However, he is now clean and sober, and Defendant submits that he is working hard at changing his behavior to societal norms. It is not in the public's best interest or that of the justice system to sentence the Defendant longer than necessary to punish him for his behavior while at the same time offering an opportunity for rehabilitation. While dealing in drugs is a serious crime, under the circumstances of the instant case a below-the-guidelines sentence, counsel suggests, would be adequate punishment and allow some hope for the Defendant, who certainly appears to have conquered his addiction because of his thus far **two-year** imprisonment and who has made a significant commitment to total rehabilitation.

3.      Counsel suggests that the Defendant has had an abnormal amount of tragedy in his life and that he wrongly coped with it by abusing substances. He is not per se a bad or evil man, but just someone who failed to cope with his personal trauma and problems.  Moving forward he has chosen a productive path. Counsel and the Defendant realize that the Defendant must serve a lengthy sentence. Nevertheless, we urge the Court not to sentence the Defendant to such a long term that it will defeat the ultimate purpose of imprisonment—i.e., exact a sufficient punishment for the crime at issue and to ensure that a defendant will change his ways.

Since Counsel last spoke to the Defendant, he reports that:

*" I have completed (1)Alternative to Violence workshop and I am about to start (2) a second advanced workshop. (3) I also passed all 5 Hi-Set tests. (4) I successfully earned my GED. (5) Signed up for a computer class (6) Attempted to get into metal shop in industries and sign up for the welding class but because of the federal hold, was not allowed to attend either one. The federal hold has prevented me from a lot of things. When I was in county it stopped me from being able to go to any privileged blocks and from working in the kitchen. Also, from getting a bail on the state case. Then when I got*

*to the max and got classed to a state prison I could not go to Pondville where the automotive program is and even though I had 3 points to go to a minimum, they would not send me because of the hold. Now I can't get cleared to do the welding class or metal shop. The welding class would give me 7.5 days of good time and a 10-day boost plus 80-day credit of good time. The metal shop would give me 15 days a month of good time and pay me about $100 a week. So please request that the last 734 days I have been locked up count towards my Fed bid.*

Counsel submits that the Defendant, as a first-time offender, could benefit from any or all of the BOP's long-term drug treatment and rehabilitation programs. However, the Court ought to also consider the effect a long sentence could have on a person who has demonstrated that they are trying to change their ways and one who is sensitive to personal trauma. Even the lower end sentence counsel suggested above—87 months—is a significant sentence, especially since the Defendant has already been imprisoned for **two years** which the BOP will probably not credit to the Defendant because he was serving an unconnected state sentence. (Defendant served the state sentence, and accepted full responsibility in that case, it appears, because his instant federal conduct was the basis for a violation.) and there was a Federal Detainer. Additional imprisonment for more than seven years is severe, of course, but in that time the Defendant can complete drug addiction and other rehabilitation programs remaining clean and sober. Moreover, as noted, the Defendant has considerable mechanical and automotive repair skills and experience, retaining the tools to start his own business upon release.  This, then, is an opportunity for the justice system to not compound the mistakes the Defendant has already made in his life and grant some hope by showing mercy and showing him that the system sees some worth in him if he continues his quest for redemption and rehabilitation. He has already completely accepted responsibility for his conduct, admitted his wrongdoing, and unilaterally started down the rehabilitative path. Accordingly, now is the time for the Court to encourage the Defendant to keep on the path he has begun and show him that there is light at the end of the

tunnel. A heavy sentence, counsel suggests, would be more discouraging than encouraging.

While the Court can certainly punish the Defendant for his behavior, counsel urges the Court to

consider what led to the Defendant's behavior and grant him some hope to keep him on the right

path. Counsel believes that it would be in the public's interest to do so.

RESPECTIVELY SUBMITTED

Dated March 10, 2026.

Respectfully submitted,
The Defendant,
Daniel Loughman,
By his attorney


*/s/  Richard C. Chambers, Jr. Esq.*
Richard C. Chambers, Jr. Esq.
BBO # 651251
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA  01940
Office: (781) 581-2031
Cell: (781) 363-1773
Fax: (781) 581-8449
E-mail:
Richard@chamberslawoffice.com


**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

/s/  Richard C. Chambers, Jr.
Richard C. Chambers, Jr.
