UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

vs.

DANIEL LOUGHMAN
     a/k/a "SWISS,"

        Defendant.

Criminal No. 24-cr-10121-FDS

## GOVERNMENT'S SENTENCING MEMORANDUM

The government submits the instant memorandum in support of its recommendation for 168 months (14 years) of incarceration for Daniel Loughman, a/k/a "Swiss," the defendant. This recommendation reflects the seriousness of the offense, and is sufficient but no greater than necessary to accomplish the goals of sentencing.

The defendant's interactions with the criminal justice system have repeatedly failed to deter the defendant from reengaging in criminal conduct, and even more concerning, his conduct has escalated to large-scale drug trafficking in recent years. Leading up to this indictment, the defendant was charged in state court during this investigation four separate times, including for bringing ammunition through TSA at Logan Airport; soliciting sexual conduct in exchange for a fee with an undercover police officer; and perhaps most concerningly, committing an armed home invasion in Lawrence and threatening the victim with a loaded Glock 9mm pistol, for which he was sentenced to two and a half to three years in state prison in 2025.  All of these instances happened in a 13-month period, starting in January 2023, immediately before this investigation into the defendant's drug trafficking escalated against him and his co-conspirators.

Even after he was caught driving around late at night with 2 pounds of crystal methamphetamine on the passenger seat next to him, he continued to participate in this

1

conspiracy. He utilized jail calls to talk about, and coordinate with, his co-defendants, including "TANK," a/k/a James SNOW.  The defendant himself summarizes the brazen and continuing nature of his conduct well, telling his girlfriend that:

> "that's it…did you hear me?...TANK (SNOW) does not get shit
> until he pays…" [1]

In the instant case, beginning in the Fall of 2023, the defendant and his co-conspirators – members and associates of the Unknown Bikers Motorcycle Club ("UBMC") – engaged in the sale of approximately 10 pounds of methamphetamine, seized by law enforcement officers who conducted over twenty controlled purchases of narcotics, largely crystal methamphetamine, and four guns.  Following the state arrest of a co-conspirator, the defendant continued to further the conspiracy on jail calls to a house of correction facility with that co-conspirator, coordinating further controlled purchases between CW-1 and the co-conspirators, until he was arrested himself a couple weeks later, driving late at night with an active state arrest warrant and 2 pounds of crystal methamphetamine on the front seat next to him.

A 168-month sentence - consecutive to the two and a half to three year state prison sentence that the defendant received on July 9, 2025 in Essex Superior Court - would communicate a clear message to the defendant, that society has laws that he simply must follow. The defendant is not merely a drug dealer.  He is not merely an outlaw motorcycle gang associate.  And he is not merely an individual who willingly, and repeatedly, disregards the terms of his pre-trial conditions of release.  Instead, he is every one of these things.  Not just because I

---

[1] The defendant, on a recorded jail call with his girlfriend, "LB," on March 16, 2024, instructing her that Snow can get his golf clubs back if he pays "half" of his drug debt, and that if he pays his drug debt in full, he can get his tools back.

say so, but because he has earned these characterizations during his criminal conduct, especially in recent years.

On March 7, 2024, the defendant was charged by complaint with one count of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and then subsequently indicted.  *See* Criminal No. 24-cr-10121, D. E. 1, 13.  On September 18, 2024, the defendant was charged in several counts of a superseding indictment, including for possession with intent to distribute 50 grams and more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(a)(viii) (Count One); and conspiracy to distribute and to possess with intent to distribute 50 grams and more of methamphetamine, in violation of 21 U.S.C. § 846 (Count Two).  On December 2, 2025, the defendant pleaded guilty to Count One and Count Two of the Superseding Indictment. D.E. 129.  A sentencing hearing is scheduled for April 1, 2026.  D.E. 150.

The Pre-Sentence Investigation Report ("PSR") calculates the defendant's Guidelines Sentencing Range ("GSR") as 151-188 months imprisonment. There is also mandatory-minimum term of 120 months incarceration. There is no plea agreement in this case. For the reasons set forth below, the government recommends a sentence of 168 months in prison, to be followed by 5 years of supervised release.

I.      THE ADVISORY SENTENCING GUIDELINES

The PSR issued by U.S. Probation determined that the defendant was accountable for at least 1.3 kilograms of "ice" methamphetamine, resulting in an offense level of 34. *See* PSR at ¶¶ 40, 41. The defendant's offense level is increased by 2, because the defendant maintained premises for the purpose of distributing a controlled substance. *See* PSR at ¶ 42. The government would also submit that the defendant's offense level is further increased by 2, because a

3

dangerous weapon was possessed in furtherance of the defendant's drug trafficking, including when he was arrested on March 6, 2024. *See* USSG §2D1.1.(B)(1)). The offense level was reduced by three levels for defendant's timely acceptance of responsibility under USSG § 3E1.1. *See* PSR at ¶¶48, 49. The defendant has three criminal history points. *See* PSR ¶ 55. Accordingly, his total offense level is 33 and his criminal history category is II. *See* PSR at ¶¶56, 113.

### a. <u>Two-Level "Stash House" Enhancement is Properly Supported.</u>

Because the defendant's primary residence was a house on Water Street in Wakefield, and because he stored and supplied large quantities of drugs from this address, the USPO properly applied the two-level enhancement under USSG. § 2D1.1(b)(12). The Sentencing Guidelines state: "If the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance, increase by 2 levels." *See* USSG § 2D1.1(b)(12). The Commentary provides additional criteria the Court should consider in applying the enhancement:

> Among the factors the court should consider in determining whether the defendant "maintained" the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises.

> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

U.S.S.G. § 2D1.1, app. n.17. Here, the record before the Court provides numerous indicia of control, use, and purpose sufficient to apply this enhancement, and the defendant does not dispute that this is his residence, telling USPO that he rented and lived at that residence for 11 years prior to being arrested. Moreover, the PSR is replete with references to the defendant's use

of the residence during controlled purchases in this case. In December, 2023, SNOW went to the defendant's residence to be supplied with methamphetamine on his way to a controlled purchase with UC-1.  *See* PSR at ¶¶12 - 13.  In January 2024, ADAMS drove to the defendant's residence on January 9th and met with the defendant in the residence's driveway, while confirming a 1-pound buy of meth on the phone with the CW-1, and then going into the residence to be supplied with methamphetamine.  *See* PSR at ¶21. In February, 2024, STEENBRUGGEN informed CW-1 that the product was coming from Wakefield and that "Dan" (the defendant) would arrive with the product shortly. *See* PSR at ¶15. In March, 2024, following an attempted controlled purchase with CW-1, the defendant had left his house and was out driving with an active warrant, when he was arrested with 2.12 pounds of methamphetamine on his front passenger seat. *See* PSR at ¶18.

Given that these visits to the premises were timed with drug sales to the UC and CW, along with other examples, the USPO drew the supportable, and only logical conclusion, that the defendant was using his residence on Water Street in Wakefield as a "stash house" for the purpose of manufacturing or distributing drugs.  *See United States v. Melendez-Rosado*, 57 F.4th 32, 38 (1st Cir. 2023); see also *United States v. Ford*, 22 F.4th 687, 694 (7th Cir. 2022).

### b. <u>**Two-Level "Dangerous Weapon" Enhancement is also Properly Supported.**</u>

Based on the defendant's possession of a knife when he was arrested with 2.12 pounds of methamphetamine, during the charged time period of this drug conspiracy, the government believes the defendant should receive a two-level enhancement under USSG § 2D1.1(b)(1).  The facts supporting this enhancement are outlined in the PSR ¶ 18.  Following an attempted controlled purchase with CW-1, the defendant was arrested on March 6, 2024 for an outstanding state warrant following a motor vehicle stop. During the defendant's arrest, Massachusetts State

Police troopers recovered a knife (retracted blade) and a cell phone, amongst other items, and a cell phone extraction subsequently revealed evidence of the drug distribution investigation. Located on the front passenger seat next to the defendant during his arrest was a green nylon bag that contained two wrapped packages of pure methamphetamine, which had a combined weight of approximately 2.12 pounds. *Id.* Here, the defendant personally possessed the knife in a location where he was transporting over 2 pounds of the narcotics during the charged period of the conspiracy. Thus, according to the application note, because the weapon was present and it was *not* "clearly improbable that the weapon was connected with the offense," USSG § 2D1, app. n.11, the Court should apply this enhancement.

Under the terms of that enhancement, "[i]f a dangerous weapon (including a firearm) was possessed" in the offense, the defendant's base offense level is increased by two levels. *See United States v. Mercer*, No. 15-1343 (1st Cir. 2016) (where Mercer was in possession of a padlock in a bandana ("padlock-bandana") at the time of the arrest. On that basis, the District Court applied the dangerous weapon enhancement to Mercer) (quoting *United States v. McDonald*, 121 F. 3d 7 (1st Cir. 1997) (Once the government proves that "a [weapon] possessed by the defendant was present during the commission of the offense," "the burden shifts to the defendant to persuade the factfinder that a connection between the weapon and the crime is clearly improbable." *Id*. at 10. *See also United States v. Quiñones–Medina,* 553 F.3d 19, 24 (1st Cir. 2009) ("The presence of an alternative basis for the possession of a weapon does not render a finding of a protection-related purpose clearly erroneous"…and also noting that the presence of a weapon is made more foreseeable by the fact that the value of the contraband is "substantial").

The PSR lists defendant's advisory GSR as 151 to 188 months' imprisonment, *see* PSR at ¶113, with a 10-year mandatory minimum. *See* PSR at ¶112. The government submits that with

additional increase by 2 under USSG §2D1.1(B)(1)), that the PSR's calculation of the GSR should be 188-235 months' imprisonment.

## II.        SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The factors set forth in 18 U.S.C. § 3553(a) assist the Court in determining a sentence that is sufficient, but not great than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2). These factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence for criminal conduct, to protect the public from further crimes of the defendant, and to provide for the needs of the defendant. They also require courts to consider the kinds of sentences available, and the GSR.

Consideration of the § 3553(a) factors demonstrates that a sentence of 168 months, followed by 5 years of supervised release, is the appropriate sentence in this case.

### a.  <u>Nature of the Offense</u>

The nature and circumstances of the defendant's drug trafficking justify a significant sentence of 168 months.  In analyzing the defendant's conduct and eventual arrest, the Court should first consider the brazen nature of the defendant's drug trafficking, while first having pending state charges for three separate recent state arrests for possession of ammunition (incident in January, 2023); sexual conduct for a free (arrested February, 2024); an indictment for home invasion, carrying a firearm without a license and assault with a dangerous weapon (arrested June, 2023); and also involving himself as the primary supplier in this large-scale methamphetamine distribution conspiracy.

i.  Background

The defendant's arrest was a result of a joint federal, state and local investigation, dubbed "Operation Crystal Road" that commenced in 2023, with the objective of disrupting the trafficking of large amounts of methamphetamine in the eastern Massachusetts area by members and associates of the Unknown Bikers Motorcycle Club ("UBMC"). During the course of this investigation, law enforcement officers conducted over twenty controlled purchases of narcotics, largely crystal methamphetamine, and guns, during recorded deals that occurred with regularity in eastern Massachusetts. Investigators made additional seizures, and ultimately recovered approximately 10 pounds of crystal methamphetamine, along with four firearms.

Under the ATF's direction, an ATF cooperating witness ("CW-1") and an undercover law enforcement officer ("UC-1") made a series of controlled purchases, which were largely recorded, from the defendant, as well as James ADAMS a/k/a "JIMMY" ("ADAMS"), James SNOW a/k/a "TANK" ("SNOW"), and Danielle STEENBRUGGEN a/k/a "DANIELLE" ("STEENBRUGGEN"), four individuals connected and known to one another through the defendant in the trafficking of large amounts of methamphetamine in the eastern Massachusetts area. Investigators learned that this was a supplier-based drug conspiracy, where ADAMS and SNOW both worked as sellers for the defendant, and STEENBRUGGEN was later introduced to CW-1 as an individual who managed the distribution operation for the defendant and also conducted sales alongside the defendant.  *See* PSR at ¶¶ 10 - 11.

ii.  The Defendant's Conduct in the Methamphetamine Conspiracy

As indicated in the statement of offense conduct, the defendant coordinated and participated in numerous controlled purchases with CW-1, alongside several of his co-defendants. Investigators observed several of his co-conspirators meeting with the defendant at

his home, including while on the way to controlled purchases.  On one occasion in December of 2023, SNOW set up a controlled purchase with UC-1, and then drove directly to the defendant's residence in Wakefield, MA. After a brief period inside the residence, SNOW (wearing a backpack) and the defendant exited the residence together and SNOW then proceeded to the meeting location, where SNOW conducted the controlled purchase for 112 grams of methamphetamine.

At another point, in January of 2024, investigators observed ADAMS drive to the defendant's residence on January 9, 2024 in Wakefield and meet with the defendant in the driveway, while on the phone with CW-1. CW-1 confirmed on the phone with ADAMS that CW-1 wished to buy "1 pound" of meth, tomorrow (January 10th). ADAMS went back inside the house with the defendant and when he exited, a female party followed ADAMS out, carrying a canvas bag. The following day, ADAMS sold the methamphetamine to CW-1 and phone toll analysis also discovered 8 phone calls between ADAMS and the defendant on January 10th.

Later on, after having supplied both SNOW (to UC-1) and ADAMS (to CW-1) with lower weights of methamphetamine for sale to their respective buyers, the defendant got himself involved personally when the weights got larger.

Notably, following ADAMS second state arrest for trafficking methamphetamine, he continued coordinating a large methamphetamine buy for ¾ of a pound from his jail cell; introduced CW-1 to STEENBRUGGEN and subsequently the defendant; and the co-conspirators arranged to have the drug buy take place in ADAMS' residence in Byfield. On that date in February, 2024, when CW-1 arrived, STEENBRUGGEN was present at the home. STEENBRUGGEN informed CW-1 that the product was coming from Wakefield and that "Dan" (the defendant) would arrive with the product shortly.  The defendant did arrive, and advised

9

CW-1 that he only had ¾ of a pound of methamphetamine and would be getting resupplied with 9 pounds from New York later that evening. The defendant handed CW-1 a bag containing ¾ pound of methamphetamine and agreed to a sell a pound of methamphetamine to CW-1 in approximately two weeks. The defendant also advised CW-1 to contact STEENBRUGGEN to coordinate future transactions.  *See* PSR at ¶¶ 14 - 16.

Moreover, during this investigation, the defendant showed no signs of slowing down. Following an attempted controlled purchase with CW-1, the defendant was arrested on March 6, 2024 for an outstanding state warrant following a motor vehicle stop. During the defendant's arrest, investigators recovered a knife and a cell phone, amongst other items, and a cell phone extraction subsequently revealed evidence of the drug distribution investigation. Located on the front passenger seat next to the defendant during his arrest was a green nylon bag that contained two wrapped packages of methamphetamine, which had a combined weight of approximately 2.12 pounds.  *See* PSR at ¶ 18.  He then continued to coordinate and communicate with his co-conspirators from his own jail call, on repeated jail calls immediately following his arrest in Wakefield. *See* PSR at ¶¶ 27 - 31.

Methamphetamine is a deadly and highly addictive drug that is an increasingly serious problem throughout the United States and in the District of Massachusetts.[2] The proportion of federal drug trafficking cases involving methamphetamine has steadily increased over the past 20 years, accounting for 48.7% of all of drug trafficking cases in 2022, and becoming the

---

[2]  Martha Bebinger, *"Meth Use Is Rising In Boston, Intensifying The Opioid Crisis,"* appearing at https://www.wbur.org/news/2018/11/21/meth-worsening-opioid-epidemic (last updated December 04, 2018).

predominant drug trafficked over the last decade.[3] Abuse of this potent stimulant is plaguing

many parts of the country, and the government has seen a significant rise in the amount of

methamphetamine in the District of Massachusetts over the course of the last four years.

Recent national reports have confirmed that methamphetamine abuse is increasing

dramatically. The National Institute on Drug Abuse found that among people aged 12 or older in

2021, 0.9% (or about 2.5 million people) reported using methamphetamine within the prior 12

months,[4] and that reflects only those who reported use. Moreover, methamphetamine is one of

the most commonly misused stimulant drugs in the world.[5] "The consequences of

methamphetamine misuse are terrible for the individual—psychologically, medically, and

socially. Using the drug can cause memory loss, aggression, psychotic behavior, damage to the

cardiovascular system, malnutrition, and severe dental problems." [6] In addition to these horrific

effects on individual health, "methamphetamine misuse threatens whole communities, causing

new waves of crime, unemployment, child neglect or abuse, and other social ills." [7]

---

[3] United States Sentencing Commission, *Methamphetamine Trafficking Offenses in the Federal Criminal Justice System,* appearing at https://www.ussc.gov/sites/default/files/pdf/research-andpublications/research-publications/2024/202406_Methamphetamine.pdf, at 16 (last viewed August 6, 2024) ("USSC 2024 Methamphetamine Trafficking Offenses")

[4] See NIDA. "Overview." *National Institute on Drug Abuse*, 24 Feb. 2023, https://nida.nih.gov/publications/research-reports/methamphetamine/overview (last updated November of 2024).

[5] Id.

[6] Id.

[7] Id.

Among people aged 12 and older in 2020, an estimated 0.6% (or about 1.5 million people) had a methamphetamine use disorder in the prior 12 months. [8] Methamphetamine is second only to fentanyl in causing drug-related deaths in the United States.[9] In 2022, there were 33,355 methamphetamine-related deaths nationwide.[10]  Indeed, this crisis has worsened each year since 2015. [11] The Centers for Disease Control and Prevention found that overdose deaths from psychostimulants, comprising mostly methamphetamine, increased by 703% from 2011 to 2021.[12] Moreover, the Drug Enforcement Administration found that 31% of drug-related deaths in the United States are caused by psychostimulants – mostly methamphetamine.[13] As of June 2, 2024, there were at 34,595 methamphetamine-related deaths nationwide for the prior 12-month period.[14]

---

[8] Id.

[9] Drug Enforcement Administration, *2024 National Drug Threat Assessment*, appearing at https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf, at 3 (last viewed July 17, 2025) ("DEA 2024 Assessment").

[10] National Center for Health Statistics, *VSRR Provisional Drug Overdose Death Counts*, appearing at https://data.cdc.gov/d/xkb8-kh2a (hereinafter, "2022 VSRR Overdose Death Counts") (last updated July 16, 2025).

[11] Id.

[12] USSC 2024 Methamphetamine Trafficking Offenses, at 6.

[13] DEA 2024 Assessment, at 6.

[14] National Center for Health Statistics, *National Vital Statistics System, Provisional Drug Overdose Death Counts,* appearing at https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last accessed June 24, 2024) (hereinafter, "2024 VSRR Overdose Death Counts").

Equally devastating, as methamphetamine production has shifted from makeshift, local labs to sophisticated Mexican laboratories, methamphetamine production and purity have increased exponentially.[15] Purity of methamphetamine has risen to nearly 100%. Indeed, in this case, investigators seized approximately 10 pounds of methamphetamine, and nearly all of it was at least 93% pure methamphetamine. As the New York Times has reported, this combination of increased production and increased purity has been particularly lethal: "There is more meth on the streets today, more people are using it, and more of them are dying." [16]

In recent years, methamphetamine has become much more prevalent in the Northeast.[17] Most of the methamphetamine supply is produced in Mexico and transported to the United States.[18] That is because methamphetamine produced in Mexico presents a lower cost, higher purity, and higher potency alternative.[19] Due to its low costs of production and maintenance, combined with the expansion of Mexican drug cartels into major United States cities and their

---

[15] Frances Robles, "*Meth, the Forgotten Killer, is Back. And It's Everywhere*", The New York Times, February 13, 2018, appearing at https://www.nytimes.com/2018/02/13/us/meth-crystal-drug.html (hereinafter, "Frances Robles, *Meth, the Forgotten Killer, is Back. And It's Everywhere*") (last updated February 13, 2018).

[16] Frances Robles, *Meth, the Forgotten Killer, is Back. And It's Everywhere*.

[17] U.S. Department of Justice Drug Enforcement Administration, *2020 National Drug Threat Assessment*, available at https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf, at 23 (last viewed July 17, 2025) (hereinafter, "DEA 2020 Assessment"); Streck, Joanna M et al., *Injection of Methamphetamine Has Increased in Boston, Massachusetts: 5 Waves of Centers for Disease Control and Prevention State Surveillance Data*, 17.3 J. OF ADDICTION MEDICINE 349–352 (2023) (last viewed July 12, 2023).

[18] DEA 2024 Assessment, at 31.

[19] Id.

extensive drug distribution networks within local communities, methamphetamine remains in constant supply and is easily accessible.[20] Purer, cheaper methamphetamine leads to more deaths. The number of methamphetamine overdoses in Massachusetts alone increased threefold from 2018 to 2022 (growing from 70 deaths to 210).[21]  Between June 2023 and June 2024, there were 215 methamphetamine-related overdose deaths in Massachusetts.[22]  In fact, "[t]he rate of all drug-related E[mergency] D[epartment] visits was highe[r] among patients residing in the Northeast[ern United States] (2,531 per 100,000 [residents])" than any other region in the nation.[23]

Even when not lethal, the physical and emotional effects of methamphetamine abuse are dramatic. Methamphetamine has a horrific impact on its users and on the community. Methamphetamine is a tremendously addictive drug, which can cause dramatic physical and emotional changes on those who use it, including increases in aggressive and violent behavior.[24]

---

[20] Id. at 3 – 16.

[21] 2022 VSRR Overdose Death Counts.

[22]  2024 VSRR Overdose Death Counts.

[23] Substance Abuse and Mental Health Services Administration, PEP22-07-03-002, *Findings from Drug-Related Emergency Department Visits, 2021*, https://store.samhsa.gov/sites/default/files/pep22-07-03-002.pdf (2022), at 9 (last viewed July 17, 2025).

[24] Mark A. R. Kleiman, Jonathan P. Caulkins, and Angela Hawken, *Drugs and Drug Policy: What Everyone Needs to Know* 120 (Oxford University Press 2011) ("There is . . . a much stronger association between violence and regular methamphetamine use. Heavy use of methamphetamine increases the likelihood of attack behaviors and aggression, with the most compelling evidence coming from laboratory studies involving mice.").

The physical effects on users are well-documented. The emotional changes are equally devastating:

> Chronic abusers may exhibit symptoms that can include significant anxiety, confusion, insomnia, mood disturbances, and violent behavior. They also may display a number of psychotic features, including paranoia, visual and auditory hallucinations, and delusions (for example, the sensation of insects creeping under the skin). Psychotic symptoms can sometimes last for months or years after a person has quit abusing methamphetamine, and stress has been shown to precipitate spontaneous recurrence of methamphetamine psychosis in formerly psychotic methamphetamine abusers.[25]

Unlike opioid addiction, there are no approved drugs available for treatment of methamphetamine addiction.[26] Addicted users who choose to stop using methamphetamine may face withdrawal symptoms including severe depression, psychosis, and intense drug cravings.[27] Even methamphetamine addicts who manage to overcome their addiction "will be at risk for relapse for years and possibly for their whole lives."[28]

The defendant's actions have been a direct contributing factor in the ongoing drug crisis in Massachusetts.  The fact that he continues to be involved in drug dealing, having escalated to

[25] National Institute on Drug Abuse, *What are the long-term effects of methamphetamine abuse,* April 7, 2017, appearing at https://www.drugabuse.gov/publications/researchreports/methamphetamine/what-are-long-term-effects-methamphetamine-abuse (last accessed June 24, 2024).

[26]  Carmen Heredia Rodriguez, *"Meth's Resurgence Spotlights Lack of Meds To Combat the Addiction,"* Kaiser Health News, January 14, 2019, appearing at https://khn.org/news/meths-resurgencespotlights-lack-of-meds-to-combat-the-addiction/ (last viewed June 24, 2024).

[27] National Institute on Drug Abuse, *Methamphetamine Drug Facts*, May 16, 2019, appearing at https://nida.nih.gov/publications/drugfacts/methamphetamine (last accessed June 24, 2024).

[28] National Institute on Drug Abuse, *Understanding Drug Use and Addiction Drug Facts*, June 6, 2018, appearing at https://nida.nih.gov/publications/drugfacts/understanding-drug-use-addiction (last viewed July 17, 2025).

involvement in a large-scale methamphetamine conspiracy in Massachusetts - and while having pending state charges for various serious felony offenses - demonstrates that a significant sentence is necessary to promote respect for the law and to provide just punishment and deterrence in this case.

### b. Characteristics of the Defendant

The government acknowledges the prompt acceptance of responsibility by this defendant. However, several aspects of his background stand out.  The Defendant has a significant criminal history and was also repeatedly arrested by law enforcement leading up to, and during, this investigation. Moreover, while on pre-trial release for separate dockets on a sex solicitation offense, possession of ammunition, and an armed home invasion, the defendant was supplying and selling large amounts of pure methamphetamine, over the course of a dozen or so recorded controlled purchases. The defendant may attempt to downplay and ignore his criminal history, but it evidences a complete disregard for the legal system.

As referenced above, the defendant has several past arrests and convictions, including on a variety of offenses. Shortly before that incident, he was charged three separate times in the course of a year, and the Defendant's criminal history has been ongoing and continuous for a large portion of his recent adult life. As outlined in several incidents amongst the Defendant's criminal history;

Home Invasion, Assault with a Dangerous Weapon, Carrying a Firearm without a License, and Possession of Ammunition without an FID Card (2477cr0331, Essex Superior Court)

At the time of the defendant's conduct and subsequent indictment in this case, he was either on pre-trial conditions of release or serving a state prison sentence in a conviction from the Essex Superior Court, Docket 2477cr0331, where he was charged with home invasion, assault with a dangerous weapon, carrying a firearm without a license, and possession of ammunition without an

FID card for an incident on June 11, 2023. In that case, the defendant entered another individual's house over a domestic dispute, racked the gun back and pointed it at the victim, stating "you're done motherfucker."  The victim was able to escape by jumping out the window, and when the defendant tried to flee the scene, he was caught by the Lawrence Police Department a short distance away, with the firearm in his jacket and several knives, including hunting knives, in different places on his person as well. In this case, the defendant was convicted and sentenced on July 9, 2025 to two and a half to three years in state prison, followed by 3 years of probation.

<u>Sexual Conduct for a Fee (2414cr0343, Chelsea District Court)</u>

On February 8, 2024, in the same 24-hour period that his co-defendant ADAMS would be stopped in a vehicle in Newburyport and arrested for trafficking methamphetamine, the defendant was arrested by the Revere Police Department, and the Massachusetts State Police High Risk Victim Unit, during a commercial sexual exploitation operation conducted in which law enforcement officers posed as escorts online.  During that investigation, following a text message conversation with the defendant's phone number in which the solicitor requested "face fucking and anal" for one hour and $320, the defendant arrived at the undercover officer's hotel room, per the agreement, and was arrested.

Ultimately, this matter was dismissed against the defendant, however he was on conditions of release for the home invasion at the time, and the Commonwealth made an argument to revoke his bail, as a result of having a separate violent offense already pending.

<u>Possession of Ammunition without an FID Card (2305cr0639, East Boston District Court)</u>

On January 25, 2023, the Massachusetts State Police charged the defendant with possession of a round of ammunition, that had been discovered during a TSA back check within Logan Airport.  A trooper spoke with the defendant, who told the officer that he went to a

firearms range recently with a relative, and the defendant was not able to produce a license to carry a firearm or a firearm identification card.

Ultimately, this matter was dismissed against the defendant, however it was also pending during the defendant's conduct in this case, and marked the first of numerous state charges the defendant faced leading up to his federal indictment in this matter.

The sentencing in this case deserves to be treated differently than a simple "hand-to-hand" drug dealing case. Along with the defendant's criminal history, the circumstances here justify the government's recommendation of a sentence of 168 months of incarceration. This, and other arguments raised throughout this memorandum, reflect the government's position that this is a very serious case.

As summarized above, the defendant has convictions for several substantial crimes in his past. Yet, the most significant sentence after a guilty finding has been the two and a half to three year state prison term, including even after violating the terms of his pre-trial release repeatedly and when given numerous opportunities on prior offenses (*see* PSR at ¶¶ 53 - 62). He has failed to learn anything from those experiences. Accordingly, the defendant should be punished in a manner that communicates to him the seriousness of his criminal behavior.

### c.  <u>Specific and General Deterrence and Protection of the Public</u>

#### i.  <u>The Need for Specific and General Deterrence</u>

The Court should also consider deterring both the defendant and others. <u>See</u> 18 U.S.C. § 3553(a)(2)(B) (the court may impose a sentence "to afford adequate deterrence to criminal conduct").

A significant sentence of imprisonment is warranted to deter others from becoming involved in any way, role, or capacity in the trafficking of methamphetamine, as the dangers

associated with these cannot be overstated. Individuals tempted to engage in drug trafficking must understand that any involvement with methamphetamine, no matter how minimal, will have immediate and serious consequences. Imprisonment is necessary to send a strong warning to others who might otherwise consider trafficking these dangerous drugs or assisting those who do.

The defendant has been arrested for serious felonies before, and recently been sentenced to state prison as a result, but he has clearly not gotten the message of compliance with society's laws from his prior criminal conduct. This sentence needs to make that point unmistakably clear, that his conduct has consequences.

Considerations of specific deterrence also support the imposition of a sentence of 168 months in prison. The defendant simply has not gotten the message despite repeated interventions from the courts. The defendant's criminal history reflects this, where arrests and felony charges have only resulted in more criminal conduct. In fact, the only effect these interventions had was to cause the defendant to be more brazen, managing, supplying and associating with large-scale methamphetamine co-conspirators, along with members and associates of an outlaw motorcycle club.

Without a doubt, the defendant himself has dealt with substance abuse issues, as outlined in the PSR. That does not give him the right to sell to others and hurt the community with these large amounts of crystal methamphetamine, or other controlled substances. This Court should impose a significant term of imprisonment to deter this defendant from ever again engaging in drug trafficking.

ii.  The Need to Protect the Public

Lastly, and perhaps most importantly, this Court should consider the need to protect the

public from the defendant. *See* 18 U.S.C. § 3553(a)(2)(C) (the court may impose a sentence to "protect the public from further crimes of the defendant"). The defendant's penchant for drug dealing, coupled with his concerning criminal history, provides for a deadly combination that simply must be addressed by the Court's sentence. This could not be made more clearly than from the actions of the defendant himself, in which he clearly, and repeatedly, demonstrated the lengths he'd go to in furtherance of his drug trafficking business.

### d. Supervised Release Conditions

The government also requests a term of 60 months of supervised release. In addition to the standard conditions, the government requests that the Court impose the special conditions set forth in the recommendations made by U.S. Probation, and below, including associational restrictions and curfew.

### i. Curfew and Associational Restrictions

The government requests that the Court impose a curfew from 9:00 p.m. to 6:00 a.m. for the first 15 months after the defendant is released from prison or any community corrections confinement (either under BOP or Court supervision). *See, e.g.,* "Maximum Impact: Targeting Supervision on Higher-Risk People, Places and Times," Pew Center for the States Public Policy Brief (March, 2009) (concluding that Probationers are "at the highest risk of re-arrest during the first few months of community supervision," that arrest rates after 15 months were substantially lowered, and thus recommendation that probation resources be "front-end loaded" to achieve maximum effect). The government also suggests that the defendant's probation officer should be allowed to relax the curfew for work or school and that it be enforced by electronic monitoring.

Further, during the period of supervised release, the defendant should be prohibited from

contacting, or being in the company of his co-defendants (namely, STEENBRUGGEN, ADAMS, or SNOW) or other individuals who the government asserts are members, associates or affiliates of the Unknown Bikers Motorcycle Club ("UBMC"), many of whom are convicted felons that the defendant is barred by the standard conditions of probation from contacting in any event.

### ii. Drug testing and Counseling

The defendant should be drug tested while on supervised release and should be given counseling if considered appropriate by Probation. *See* PSR at ¶¶89 - 99.

### III.   THE GOVERNMENT'S RECOMMENDATION

For the foregoing reasons, those contained in the PSR, and those to be presented at the sentencing hearing, the government requests the following sentence:

- a term of 168 months' imprisonment;

- a fine within the Guidelines, as calculated by the Court, unless the Court finds that the defendant is not able to pay a fine;

- a term of 60 months' supervised release with the conditions referenced above and recommended by probation; and

- a special assessment of $200.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:   /s/ John T. Dawley, Jr.
John T. Dawley, Jr.
Assistant United States Attorney

Dated: March 26, 2026

21

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served a copy of the foregoing upon all counsel of record by electronic filing notice.

/s/ John T. Dawley, Jr.
Assistant U.S. Attorney

Dated: March 26, 2026